**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| J.A.L.L. a Minor, by his next friend, L.A.L.L., <br><br> *Plaintiff-Petitioner*, <br><br> v. <br><br> David WESLING, in his official capacity as Director of the Boston Field Office; Todd LYONS, in his official capacity as Acting Director U.S. Immigration and Customs Enforcement; Kristi NOEM in her official capacity as Secretary of Homeland Security; Robert F. KENNEDY, JR. in his official capacity as Secretary of Health and Human Services; Angie SALAZAR, in her official capacity as Acting Director of the Office of Refugee Resettlement; Alex ADAMS, in his official capacity as Assistant Secretary of the Administration for Children and Families; Regina MOLLER, in her official capacity as Executive Director of Noank Community Support Services; U.S. Department of Homeland Security; U.S. Immigration and Customs Enforcement; U.S. Department of Health and Human Services; U.S. Office of Refugee Resettlement; Administration for Children and Families; Noank Community Support Services. <br><br> *Defendant-Respondents*. | Case No. 3:25-cv-2125 <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND PETITION FOR WRIT OF HABEAS CORPUS** <br><br> **ORAL ARGUMENT REQUESTED** |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND**
<u>**PETITION FOR WRIT OF HABEAS CORPUS**</u>

1

**INTRODUCTION**

1.      J.A.L.L. is 17 years old. As of this filing, he has been forcibly and unlawfully detained by the Department of Homeland Security ("DHS") for 138 days. J.A.L.L. is lawfully present in the United States and has not been charged with any crime. His ongoing and inexplicable detention is a violation of the United States Constitution and the fundamental human liberties it guarantees. J.A.L.L. invokes the authority of this Court to secure his release to his father, who brings this action on his son's behalf.

2.      J.A.L.L. is an eleventh-grade student in Massachusetts, where he is a valued member of his community. He has been granted Special Immigrant Juvenile Status ("SIJS"), dated November 8, 2023, by U.S. Citizenship and Immigration Services ("USCIS"), a sub-agency of DHS—meaning that a court has found and USCIS has agreed—that it is not in his best interest to be returned to his home country of Ecuador. USCIS also has granted him Deferred Action, which provides protection from removal (also known as "deportation"). Finally, on December 26, 2023, the Executive Office for Immigration Review, Boston Immigration Court terminated removal proceedings against J.A.L.L. because he had been granted SIJS and will be eligible to adjust his legal status to a Lawful Permanent Resident when a visa becomes available.

3.      On August 3, 2025, while a passenger in a parked car, J.A.L.L. was approached by police in Buffalo, New York. After verifying J.A.L.L.'s identity and allowing him to leave, the police stopped J.A.L.L. again, detained him, and contacted DHS officials. When the DHS officials arrived, they patted J.A.L.L. down and asked to see his papers. Although J.A.L.L. provided his Employment Authorization Document ("EAD") to the DHS officials and was not alleged to have done anything wrong, the DHS officials handcuffed, arrested, and transported him to a DHS facility. J.A.L.L. informed the DHS officials that he had approved SIJS with Deferred Action, removal proceedings against him had been terminated, and that he lived with his father, who had previously

2

been approved as J.A.L.L.'s sponsor by the Office of Refugee Resettlement ("ORR"). Nevertheless, and in violation of J.A.L.L.'s constitutional and statutory rights, DHS detained him, transferred him to the custody of ORR, and forcibly sent him to a shelter in Texas where he was held for two months. J.A.L.L. was then transferred to another ORR shelter in Mystic, Connecticut, where he has been held for the past two and ½ months. Defendant-Respondents have detained J.A.L.L. for 138 days even though he has been granted SIJS and Deferred Action by USCIS, cannot lawfully be removed, and a state court has found—and USCIS has agreed—it is in his best interests to remain in the custody of his father and not be returned to the dangerous conditions in Ecuador.

4.      J.A.L.L.'s arrest and detention violated his constitutional and statutory rights. Because J.A.L.L. cannot be removed, his ongoing detention—particularly without any individualized review—serves no lawful purpose and runs afoul of the substantive and procedural due process protections of the Fifth Amendment, the Fourth Amendment, the Administrative Procedure Act ("APA"), the *Accardi* doctrine, and the Immigration and Nationality Act ("INA") and its implementing regulations. J.A.L.L. and his father, L.A.L.L. ("Mr. Lema"), as J.A.L.L.'s next friend, bring this complaint and habeas petition seeking J.A.L.L.'s immediate release from DHS custody because his arrest and ongoing detention were and continue to be unlawful. To be clear, J.A.L.L. does not challenge in this forum Defendant-Respondents' ability to initiate removal proceedings against him despite J.A.L.L. being protected against removal by his grant of Deferred Action; Plaintiff-Petitioner strictly seeks to liberate J.A.L.L. from detention on the basis that his arrest was unlawful, his detention serves no lawful purpose and is causing severe harm, and his removal is not reasonably foreseeable.

5.      J.A.L.L. and his next friend, Mr. Lema, respectfully ask this Court to hold that his continued detention is unlawful and order his immediate release from custody, or in the alternative, hold a bond hearing. They also respectfully ask that this Court order Defendant-Respondents not to

3

transfer him outside of the District of Connecticut for the duration of this proceeding.

## PARTIES

6.      Plaintiff-Petitioner J.A.L.L. is a citizen of Ecuador and previously resided in Massachusetts. He entered the United States with his older brother on approximately November 21, 2020, having been abandoned and neglected by their mother, and seeking safety from gang violence and threats to their lives in Ecuador. J.A.L.L. and his brother were designated as "unaccompanied children," served with a Notice to Appear ("NTA") before an immigration judge, and were released to the care of their father by ORR on December 17, 2020.  J.A.L.L. was subsequently granted SIJS with Deferred Action and Employment Authorization. His removal proceedings were terminated by the Boston Immigration Court in December 2023. J.A.L.L. had been at liberty until he was unlawfully detained by DHS personnel on August 3, 2025. He is presently in the custody and direct control of the Defendant-Respondents and their agents in Mystic, CT.

7.      Plaintiff-Petitioner L.A.L.L., as next friend and on behalf of J.A.L.L., is J.A.L.L.'s biological father, sole legal and physical custodian, and ORR-approved sponsor. He has provided care and custody for J.A.L.L. since J.A.L.L. entered the United States and was released to Mr. Lema's care by ORR in December 2020. He lives in Medway, MA.

8.      Defendant-Respondent David Wesling is named in his official capacity as the Acting Field Office Director of the Boston Field Office for Immigration and Customs Enforcement ("ICE") within DHS. The Hartford ICE office operates under and reports to the Boston Field Office. In this capacity, Respondent Wesling is also responsible for the administration of immigration laws and the execution of detention and removal determinations and is a legal custodian of J.A.L.L.

9.      Defendant-Respondent Todd Lyons is named in his official capacity as the Acting Director of U.S. Immigrations and Customs Enforcement. As the Acting Director of ICE, Respondent Lyons is a legal custodian of J.A.L.L.

4

10.     Defendant-Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security for the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(a); routinely transacts business in the District of Connecticut; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a legal custodian of J.A.L.L.

11.     Defendant-Respondent Robert F. Kennedy, Jr. is named in his official capacity as the Secretary of Health and Human Services ("HHS"). In this capacity, he ultimately oversees the ORR, a sub-component of HHS, that is responsible for the care of unaccompanied immigrant children and as such, he is a legal custodian of J.A.L.L.

12.     Defendant-Respondent Angie Salazar is named in her official capacity as the Acting Director, Office of Refugee Resettlement. In this capacity, she oversees the staff of ORR who are responsible for the care of unaccompanied immigrant children. ORR is the government entity directly responsible for J.A.L.L.'s ongoing detention and as such, she is a legal custodian of J.A.L.L.

13.     Defendant-Respondent Alex Adams is named in his official capacity as the Assistant Secretary of the Administration for Children and Families ("ACF"). In this capacity, he is responsible for ORR, the component agency responsible for Petitioner's detention and custody. Respondent is a legal custodian of J.A.L.L.

14.     Defendant-Respondent Regina Moller is named in her official capacity as the Executive Director of Noank Community Support Services. In this capacity, she oversees the staff of ORR who are responsible for the care of unaccompanied immigrant children being held at Noank Community Support Services in Mystic, CT, and as such is a custodian of J.A.L.L.

15.     Defendant-Respondent U.S. Department of Homeland Security is an executive department of the United States Government headquartered in Washington, D.C. DHS is the parent

5

agency of ICE.

16.    Defendant-Respondent U.S. Immigration and Customs Enforcement is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants.

17.    Defendant-Respondent U.S. Department of Health and Human Services is an executive department of the United States Government headquartered in Washington, D.C. HHS is the parent agency of the ORR.

18.    Defendant-Respondent Office of Refugee Resettlement is a component agency of HHS and is responsible for the care, custody, and wellbeing of unaccompanied immigrant children.

19.    Defendant-Respondent Administration of Children and Families is the operating division of HHS and is responsible for the welfare of children and families. It is comprised of 23 offices, including ORR, the component agency responsible for Petitioner's detention and custody.

20.    Defendant-Respondent Noank Community Support Services ("NCSS") is an agency licensed by the State of Connecticut and contracted by ORR to provide care for unaccompanied immigrant children in NCSS's residential shelter located in Mystic, CT.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus), Art. I § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. § 2201 (Declaratory Judgment Act).

22.    Federal district courts have jurisdiction to hear habeas claims brought by noncitizens challenging the lawfulness of their detention. *See Demore v. Kim*, 538 U.S. 510, 516–17 (2003) (recognizing habeas jurisdiction over immigration detention challenges); *Zadvydas*, 533 U.S. at 687 (same); *Tran v. Mukasey*, 515 F.3d 478, 482 (5th Cir. 2008) (same).

23.    Venue is proper in this District under 28 U.S.C. §§ 1391(e) because J.A.L.L. is

detained within the District of Connecticut, and a substantial part of the events continue to occur within this District.

## FACTUAL ALLEGATIONS

24.    J.A.L.L. is a 17-year-old boy who fled Ecuador with his brother in late 2020. J.A.L.L. entered the United States with his brother on or about November 21, 2020. *See* Exhibit A (Administrative Warrant for Arrest of Alien, dated November 22, 2020).[1]

25.    After entering the United States, J.A.L.L. was detained by DHS and served with a NTA before an Immigration Judge ("IJ") and was charged with being subject to removal pursuant to 212(a)(6)(A)(i) of the INA (8 U.S.C. § 1182(a)(6)(A)(i)). *See* Exhibit B (Notice to Appear, dated November 22, 2020). Due to his status as an unaccompanied child, J.A.L.L. was transferred to the custody of ORR. *See* Exhibit C (Notice of Custody Determination, dated November 22, 2020).

26.    On December 17, 2020, J.A.L.L. was released to the care of his father, Mr. Lema, who ORR had approved as J.A.L.L.'s sponsor. *See* Exhibit D (ORR Verification of Release, dated December 17, 2020). Mr. Lema took J.A.L.L. to his home in Medway, Massachusetts, where J.A.L.L. resided until he was arrested and detained by DHS officials on August 3, 2025.

27.    In March 2023, Mr. Lema began the family court process to obtain sole legal and physical custody of J.A.L.L. On July 14, 2023, the Massachusetts Probate and Family Court issued a Judgment of Dependency, pursuant to G.L. c. 119, § 39M, awarding Mr. Lema sole legal and physical custody of J.A.L.L. In addition, the Court entered an Order incorporating Special Findings and Rulings of Law finding that it "is not in [J.A.L.L.'s] best interest to return to his or his parents' home country of nationality, Ecuador," where he would lack "stability, safety, and access to education and healthcare." *See* Exhibit E (Judgment of Dependency and Incorporated Special

---

[1] Pursuant to 28 U.S.C. § 1746, the declaration of Renée Mihail in support of this habeas petition and its exhibits is being docketed separately.

Findings and Rulings of Law, signed by Judge of the Commonwealth of Massachusetts, The Trial Court, Probate and Family Court, dated July 14, 2023).

28.    On August 18, 2023, J.A.L.L. petitioned for SIJS with USCIS. On November 8, 2023, USCIS granted J.A.L.L.'s petition for SIJS and issued a grant of Deferred Action, a determination by DHS to defer removal of an individual as an act of prosecutorial discretion. The Approval Notice further provided that J.A.L.L.'s "grant of deferred action will remain in effect for a period of four years from the date of this notice unless terminated earlier by USCIS" and that J.A.L.L. was eligible to apply for employment authorization. *See* Exhibit F (I-797 Notice of Action, SIJS Approval Notice, dated November 8, 2023).

29.    On December 26, 2023, the Boston Immigration Court terminated J.A.L.L.'s removal proceedings, along with his older brother's, on the basis that they are "the beneficiaries of an approved special immigrant juvenile petition. This will allow USCIS to adjudicate the applications for adjustment of status in keeping with *Matter of Coronado Acevedo*, 28 I & N Dec 648 (AG 2022)." DHS did not oppose J.A.L.L.'s motion to terminate his removal proceedings. *See* Exhibit G (Order of the Immigration Judge, USDOJ, EOIR, Boston Immigration Court, dated December 26, 2023).

30.    On February 6, 2024, J.A.L.L.'s Form I-765, Application for Employment Authorization was granted by USCIS and is valid until November 8, 2027. *See* Exhibit H (Employment Authorization card of J.A.L.L.). J.A.L.L.'s EAD allows him to work lawfully in the United States.

31.    From December 17, 2020 until August 3, 2025, J.A.L.L. resided in Medway, Massachusetts under his father's care. J.A.L.L. attended public school and was a valued member of the Medway community. J.A.L.L. and his family attended church together on Sundays and J.A.L.L. played on his school's soccer team. Most recently, J.A.L.L. was enrolled at a public high school in

Medway where he completed the 10th grade in June 2025. J.A.L.L. had excellent school attendance and was a strong student who worked hard to earn A and B grades towards his goal of attending college.

32.    On August 3, 2025, while visiting family in Buffalo, New York, J.A.L.L. was arrested and detained by DHS personnel.[2] While sitting in his brother Dennis's car, J.A.L.L., Dennis, and a friend were approached by two police officers who asked to see Dennis's driver's license and to see documents for all three individuals. Dennis produced his driver's license and EAD, J.A.L.L. produced his EAD, and the friend, a U.S. citizen, produced his U.S. Passport. After checking their documents, the officers ended the encounter.

33.    Shortly thereafter, as Dennis drove down the street, the same officers stopped their car. Although he was not driving, the officers asked J.A.L.L. for his driver's license. J.A.L.L. explained that he only had a driver's permit and his EAD. Again, the officers took J.A.L.L.'s EAD, his brother's EAD, and the friend's U.S. Passport, to their police car. After about 20 minutes, two cars arrived with DHS officials.

34.    The DHS officials patted J.A.L.L., his brother, and friend down and examined their EADs and Passport again, using a camera device to confirm they matched the individual photos on the documents. After informing them that they would be taken to a DHS facility to be fingerprinted and then released, the DHS officials handcuffed J.A.L.L. and his brother and placed them in one car, and placed the friend in another car and transported them to the DHS facility.

35.    At the facility, DHS officials directed J.A.L.L. to answer their questions, stated that he could not call anyone, including his father, and did not inform J.A.L.L. that he had the right to speak with an attorney or to refrain from answering their questions. J.A.L.L. told the DHS officials that he and his brother lived in Massachusetts with their father and have approved SIJS, EADs, and

---

[2] The DHS personnel appeared to be affiliated with ICE. *See J.A.L.L. Declaration,* ¶ 13.

9

that their removal proceedings had been closed. J.A.L.L. also told the DHS officials that he has a valid social security number. *See* Exhibit I (Social Security Card of J.A.L.L.) The DHS officials dismissed this information and recorded J.A.L.L.'s answers to their questions incorrectly. The DHS officials swore at J.A.L.L. and used intimidating tactics, including threatening J.A.L.L. and his brother with deportation. They instructed and pressured J.A.L.L. and his brother to sign papers in English without explaining what the papers were. J.A.L.L. was subsequently informed by ORR officials in Texas (as detailed below) that by signing, he and his brother had consented to be voluntarily removed from the United States.

36.     J.A.L.L.'s brother, who was 18 years old, was then transported to an adult detention facility, and J.A.L.L. was transferred to the custody of ORR and sent to a shelter in Texas. Upon arriving in Texas, J.A.L.L. was informed by his caseworker that he would be deported to Ecuador because he had signed papers agreeing to be voluntarily removed from the United States. After J.A.L.L. objected, explaining that he had been pressured by the DHS officials to sign papers and had not known what the papers were, ORR began the reunification process of evaluating J.A.L.L.'s father as his sponsor.

37.     J.A.L.L. has now been in custody for 138 days. He spent approximately two months at the shelter in Texas before being transferred, on October 9, 2025, to the shelter in Mystic, Connecticut, operated by NCSS (a grantee of ORR). J.A.L.L. has now been held at the shelter in Mystic, CT for over two months.

38.     DHS arrested and detained a then sixteen-year-old (now seventeen-year-old) with approved SIJS and a grant of Deferred Action, who cannot be lawfully removed to dangerous conditions in Ecuador, as Congress expressly designed SIJS to allow such children to remain in the United States to pursue lawful permanent residence. *See* 8 U.S.C. § 1255(h) (deeming SIJ youth "paroled" for adjustment); 8 U.S.C. § 1227(c) (waiving specified removal grounds for SIJ); *cf.* 8

U.S.C. § 1155; 8 C.F.R. § 205.2 (revocation only with notice, reasons, and an opportunity to respond).

39.    In addition, given his grant of Deferred Action that is in effect until November 8, 2027, the government cannot remove J.A.L.L. unless it first terminates his Deferred Action grant, which . *See* USCIS Memo re: Special Immigrant Juvenile (SIJ) Deferred Action, June 26, 2023 (USCIS may only terminate Deferred Action "if the SIJ-classified individual was not eligible at the time of the initial grant of deferred action, the SIJ Form I-360 is revoked, or if they are no longer eligible based on new information").[3]

40.    Finally, an immigration court terminated J.A.L.L.'s removal proceedings in 2023 on the basis of J.A.L.L.'s approved SIJS and so that he can adjust status to become a Lawful Permanent Resident when a visa becomes available. Although DHS served J.A.L.L. with a new NTA, it alleges the same violation as alleged in 2020, and the bases for the immigration court's initial termination of removal proceedings in 2023 still exist: J.A.L.L. has approved SIJS, has a grant of Deferred Action, and is still awaiting the availability of a visa so that he can adjust his legal status. Detaining J.A.L.L. now therefore has no permissible purpose.

41.    J.A.L.L. is a valued member of his school and community in Medway, Massachusetts. He has a pathway to permanent status in the United States through his approved SIJS and has a grant of Deferred Action with Employment Authorization. Under these circumstances, he cannot be removed from the United States, and he can work while he awaits the availability of a visa. Prior to his August 2025 detention, J.A.L.L. had been living with his father, his sole legal custodian and ORR-approved sponsor. There was no basis for the government's arrest and detention of J.A.L.L., and no permissible purpose for J.A.L.L.'s continued detention. J.A.L.L.

---

[3] USCIS Memo re: Special Immigrant Juvenile (SIJ) Deferred Action, June 26, 2023, https://www.ilrc.org/sites/default/files/2025-09/FOIA%20Results%20on%20SIJS%20Deferred%20Action%20Policy.pdf at 131–132.

should be released to the care of his father in Medway, Massachusetts, where he is enrolled in school and has a caring adult with an order of sole custody to look after him.

## LEGAL FRAMEWORK

### A. Requirements of 28 U.S.C. § 2243

42. The Court must grant the petition for writ of habeas corpus or order Defendant-Respondents to show cause "forthwith" as to why J.A.L.L. is not entitled to relief. 28 U.S.C. § 2243. If an order to show cause is issued, the Court must require Defendant-Respondents to file a return "within three days unless for good cause additional time, not exceeding twenty days, is allowed." *Id.*

43. Courts have long recognized the significance of the habeas statute in protecting individuals from unlawful detention. The Great Writ has been referred to as "perhaps the most important writ known to constitutional law . . . affording as it does a *swift* and imperative remedy in all cases of illegal restraint of confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963) (emphasis added).

### B. Special Immigrant Juvenile Status Provides a Pathway to Permanent Status for Certain Vulnerable Young People

44. In 1990, Congress created SIJS to protect vulnerable immigrant children and provide them a pathway to citizenship. Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978 (1990) (amending various sections of the INA); Special Immigrant Status, 58 Fed. Reg. 42843, 43844 (Aug. 12, 1993) ("This rule alleviates hardships experienced by some dependents of United States juvenile courts by providing qualified [noncitizens] with the opportunity to apply for special immigrant classification and lawful permanent resident status, with [the] possibility of becoming citizens of the United States in the future."). Since 1990, Congress has amended the INA multiple times to expand the protections of SIJS, most recently in 2008, through the Trafficking

12

Victims Protection Reauthorization Act, Pub. L. 110-457, § 235(d), 122 Stat. 5044 (2008).

45.     To be granted SIJS, youths like J.A.L.L. must first "satisfy[] a set of rigorous, congressionally defined eligibility criteria." *Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 163 (3d Cir. 2018). Specifically, the INA provides that those eligible for SIJ designation, as relevant here, are noncitizen youth who are present in the United States; who have been declared dependent on a state juvenile court; who cannot be reunified with one or both parents because of abuse, neglect, or abandonment; and for whom it has been determined that it is not in their best interest to return to their country of origin. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c).

46.     Crucially, a noncitizen youth is eligible for SIJS only if he or she is "*present* in the United States." 8 U.S.C. § 1101(a)(27)(J) (emphasis added). This requirement makes perfect sense in light of the purpose of the SIJ statute. SIJS is predicated on a state court finding that the youth cannot be safely reunited with one or both parents, nor safely sent back to their country of origin. The design of this program, then, "show[s] a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for [Lawful Permanent Resident] status." *Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011) (abrogated on other grounds).

47.     Youth can apply for SIJS upon receipt of a state court order finding they cannot be safely reunited with one or both parents nor safely be sent back to their country of origin. The application process includes submitting a Form I-360 Petition for SIJS to USCIS, along with the predicate state court order and other supporting evidence. *See* 8 C.F.R. § 204.11(b). USCIS then considers the application and supporting documentation to determine whether to exercise its statutory "consent function" to approve the petition. *See* 8 U.S.C. § 1101(a)(27)(J)(iii). By exercising its statutory consent function to grant SIJS, the agency recognizes the state court's determinations, including that the child's return to their country of origin would be contrary to their best interests. 8 U.S.C. § 1101(a)(27)(J)(iii).

48.     SIJS may be revoked only for what the Secretary of Homeland Security deems "good and sufficient cause." 8 U.S.C. § 1155; 8 C.F.R. § 205.2. According to USCIS regulations, such revocation must be made upon notice to the youth in question, who must be permitted the opportunity to submit evidence in opposition to the revocation. *See* 8 C.F.R. § 205.2. If status is ultimately revoked, the youth is entitled to notice and the opportunity to appeal the decision. *See* 8 C.F.R. § 205.2(c) & (d). Revocation of SIJS may only be performed by a USCIS officer authorized to approve such petition in the first instance. *See* 8 C.F.R. § 205.2(a).

49.     The main benefit of SIJS—and indeed, its core purpose—is that it confers on vulnerable young people like J.A.L.L. the right to seek Lawful Permanent Resident status while remaining in the United States, through a process called adjustment of status. *See* 8 U.S.C. § 1255(h).

50.     To facilitate this process, Congress removed numerous barriers to adjustment of status for SIJS beneficiaries through amendments to the SIJ provisions in 1991 and again in 2008. For example, SIJ youth are "deemed . . . to have been paroled into the United States" for the purposes of adjustment of status. 8 U.S.C. § 1255(h)(1). Further, Congress exempted SIJ youth from many common inadmissibility grounds and created a generous waiver of many of the non-exempted inadmissibility grounds. 8 U.S.C. § 1255(h)(2). Congress explicitly provided that certain grounds for removal "shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title [the SIJ statute] based upon circumstances that existed before the date the [noncitizen] was provided such special immigrant status." 8 U.S.C. § 1227(c).

51.     Although SIJS renders youth eligible to apply for adjustment, they can only do so when a visa is immediately available to them. 8 U.S.C. § 1255(h). However, there is an annual limit on visas available to SIJ beneficiaries. 8 U.S.C. § 1153(b)(4). And since 2016, the number of SIJ beneficiaries has surpassed the supply of available visas for most countries, leaving what has been

estimated to be more than 100,000 young people in a backlog, waiting to apply for adjustment of status.

52. Despite the lack of an immediately available visa, waiting SIJ beneficiaries are the same vulnerable young people that the SIJ statute was designed to protect. The fact that no visa is currently available because a numerical limit has been reached changes nothing about their eligibility determination by USCIS, or Congress's intent that they be afforded a pathway to LPR status and, eventually, citizenship. These are the same individuals whom state courts have determined cannot safely be reunited with their parent(s) or returned to their home country.

53. Taken together, the structure of the SIJ program—including the requirement that recipients remain in the United States to move forward in the process, the grant of parole for the purpose of adjustment, and the waiver of grounds of inadmissibility and removability—evinces Congress' intent that SIJS recipients remain safely in the United States until they can adjust to become Lawful Permanent Residents.

### C. Deferred Action Protects SIJ Beneficiaries From Removal

54. In March 2022, to address the SIJ visa backlog, USCIS announced that all young people granted SIJS would also be considered for a discretionary grant of deferred action, meaning that they would be protected from deportation while waiting for a visa to become available. In enacting this policy, USCIS itself acknowledged that "Congress likely did not envision that SIJ Plaintiff-Petitioner would have to wait years before a visa became available."[4] Persons granted deferred action, like J.A.L.L., are shielded from deportation and are eligible to apply for employment authorization under 8 C.F.R. § 274a.12(c)(14).

---

[4] USCIS, Policy Alert PA-2022-10, at 1 (Mar. 7, 2022),
https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf
("2022 Policy Alert"); *see also* USCIS, Training regarding SIJ Deferred Action Background, at 11–12,
https://www.ilrc.org/sites/default/files/2025-09/FOIA%20Results%20on%20SIJS%20Deferred%20Action%20Policy.pdf.

55.    Importantly, "USCIS has the sole authority to grant and terminate deferred action for noncitizens with SIJ classification."[5] And, generally, USCIS may only terminate deferred action "if the SIJ-classified individual was not eligible at the time of the initial grant of deferred action, the SIJ Form I-360 is revoked, or if they are no longer eligible based on new information."[6]

56.    ICE's attempt to remove SIJ youth who have been granted deferred action undermines the purpose and intent of the SIJ statutory scheme and is in direct opposition to a grant of deferred action.[7]

### D. Legal Framework and Policies Governing Custody and Release of Immigrant Children

57.    Federal law recognizes that minors are distinctively vulnerable and establishes a child-welfare framework, not a carceral one, to govern their custody and release.

58.    The *Flores* Settlement Agreement guarantees that children shall be released "without unnecessary delay" and requires the Government to undertake "prompt and continuous efforts" towards family reunification, as well as guarantees children the right to a bond hearing before an immigration judge. Although the government has attempted to replace the *Flores* Settlement by regulation, federal courts have preserved its core protections for decades. Although comprehensive HHS regulations governing the Unaccompanied Children ("UC") program were promulgated in 2024 and the *Flores* court partially terminated the consent decree as to HHS, the *Flores* remains in place as to DHS.

59.    In 2002, Congress passed the Homeland Security Act ("HSA") which transferred

---

[5] *See supra* note 2.
[6] *Id.*
[7] In June 2025, USCIS rescinded the SIJ deferred action policy as applied to SIJ youth waiting to be granted deferred action. In a class action challenge to this rescission, *A.C.R. v. Noem*, No. 1:25-cv-3962, the Eastern District of New York recently issued an order staying the government's recission. Although J.A.L.L. was previously granted deferred action in 2023, the decision still applies to his ability to seek a renewal. EDNY ruled that the government did not consider reliance interests of youth with approved SIJS and that absent a stay, the plaintiffs were likely to face irreparable harm due to the heightened risk of removal they would face without the protection of deferred action.

the care and custody of unaccompanied immigrant children from the Immigration and Nationality Service ("INS") to the Office of Refugee Resettlement ("ORR"), housed within the Department of Health and Human Services. ORR is not a security agency; its mission is to "incorporat[e] child welfare values" into the care and placement of unaccompanied immigrant children.

60. Congress further codified and strengthened these protections. The 2008 William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") requires that (1) DHS transfer unaccompanied children to HHS custody within 72 hours (absent exceptional circumstances), 8 U.S.C. § 1232(b)(3); (2) ORR "promptly place[]" such children "in the least restrictive setting that is in the best interest of the child," *id*. § 1232(c)(2); and (3) with limited exceptions not relevant here, place them in full removal proceedings under 8 U.S.C. § 1229a rather than expedited removal, *id*. § 1232(a)(5)(D).

61. ORR's Policy Guide[8] also contains procedures governing the release of children in its care. The guide provides for ORR to "begin[] the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care." ORR has policies and procedures that "require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as 'sponsors.'"

62. In 2024, HHS/ORR issued the Unaccompanied Children Program Foundational Rule—the first comprehensive, binding regulations governing ORR's custody, care, placement, and release of unaccompanied children. 45 C.F.R. part 410 (effective July 1, 2024). The rule formalizes long-standing *Flores*/TVPRA principles: child-welfare decision-making; least-restrictive placement; prompt family reunification with appropriate sponsor vetting; access to counsel and supportive services; and robust grievance, oversight, and monitoring structures. It became effective

---

[8] ORR Unaccompanied Alien Children Bureau Policy Guide, ORR (Aug. 8, 2025), https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide.

July 1, 2024.

63. Critically, the law's "least restrictive setting" and "best interests" mandates are not satisfied by mere transfer to ORR; they require prompt reunification or release to a suitable sponsor whenever safe and feasible. Congress charged ORR with making "continuous efforts" toward family placement, and ORR's governing policies prioritize release to a parent, legal guardian, or other qualified adult relative able to provide care and physical custody. *See* 6 U.S.C. § 279(b)(1)(C)–(D); 8 U.S.C. § 1232(c)(2).

64. The system is designed to avoid exactly what DHS did here. In 2020, J.A.L.L. and his father underwent the reunification process which resulted in ORR approving Mr. Lema as J.A.L.L.'s sponsor and releasing J.A.L.L. to his care and custody. If DHS can upend ORR's decisions to reunify unaccompanied children with their parents under sponsor agreements, and serially re-arrest sponsored unaccompanied children without evidence of changed circumstances, the protections afforded children like J.A.L.L. under the TVPRA are meaningless. When DHS re-arrested J.A.L.L. and notified ORR of this arrest, ORR treated him and his father as though this was their first contact with ORR, ignoring its own previous evaluation of both J.A.L.L. and his father, Mr. Lema, as J.A.L.L.'s sponsor. Where a child already resides safely with a sponsor in the community, seizing the child without cause and removing him from that home, to detain him at shelter-level custody (or any more restrictive placement), is the opposite of "least restrictive" and serves no best-interest rationale.

## CLAIMS FOR RELIEF

### COUNT ONE
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE CONSTITUTION (SUBSTANTIVE DUE PROCESS) AND 8 U.S.C. § 1231(a)(6); ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. §§ 702, 706**

65. The Plaintiff-Petitioner realleges and incorporates by reference each and every

allegation contained in the preceding paragraphs as if fully set forth herein.

66.      The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

67.      J.A.L.L. has a fundamental interest in liberty and being free from official restraint. He further has a fundamental liberty interest under the Due Process Clause in remaining together as a family with his father, Mr. Lema. Because there is no lawful or legitimate basis for J.A.L.L.'s arrest, ongoing detention, and continued separation from his father, his removal is not reasonably foreseeable, his detention and separation from his father is neither authorized by 8 U.S.C. § 1231(a)(6) nor related to any legitimate government interests, and in violation of the substantive due process protections of the Fifth Amendment.

### <u>COUNT TWO</u>
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE CONSTITUTION (PROCEDURAL DUE PROCESS); ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. §§ 702, 706**

68.      The Plaintiff-Petitioner realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

69.      The procedural due process guarantee of the Fifth Amendment requires that individuals be provided notice and an opportunity to be heard before being deprived of liberty or property interests. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

70.      The Due Process Clause entitles J.A.L.L. to meaningful process to determine whether his detention without charge and his forcible separation from his father is lawful and

justified. J.A.L.L.'s arrest, detention, and separation from his father without an opportunity to contest any of these deprivations of his fundamental liberty interests before a neutral adjudicator violates his procedural due process rights to Due Process Clause of the Fifth Amendment of the Constitution.

**COUNT THREE**
**VIOLATION OF THE FOURTH AMENDMENT OF THE CONSTITUTION;**
**ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. §§ 702, 706**

71.     Plaintiff-Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

72.     The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has consistently recognized that immigration arrests and detentions are "seizures" within the meaning of the Fourth Amendment. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1044 (1984) (acknowledging that deportation proceedings are civil, but the Fourth Amendment still applies to the "seizure" of the person).

73.     On August 3, 2025, J.A.L.L. was arrested and detained by DHS officials. He has been forcibly detained since that time, and confined in a restrictive setting. There was and is no probable cause to believe that J.A.L.L. committed any offense. With the protection of his SIJ/deferred action status, there was and is no lawful basis for his arrest and ongoing detention arising from his immigration status. At the time of J.A.L.L.'s arrest, he had been living at liberty pursuant to a determination by ORR to place him in the care of his father ("the least restrictive setting"). J.A.L.L.'s arrest and ongoing detention constitute egregious violations of the Fourth Amendment to the United States Constitution.

**COUNT FOUR**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706**

20

74.     The Plaintiff-Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

75.     Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

76.     Defendant-Respondents' arrest and detention of J.A.L.L. pursuant to 8 U.S.C. § 1231(a)(6) is arbitrary and capricious, not in accordance with the law, and contrary to constitutional right because he has approved SIJS, a grant of Deferred Action, his removal is not reasonably foreseeable, and there is no other justification for his detention.

77.     Defendant-Respondents failed to articulate a reasoned explanation for their decision in light of all available evidence and failed to consider all the aspects of the problem as well as obvious, less-restrictive alternatives to detention.

78.     Additionally, Defendant-Respondents acted arbitrarily, capriciously, and contrary to law by disregarding the controlling child-welfare framework governing custody and release of immigrant children. Congress, through the Homeland Security Act and the TVPRA, requires that unaccompanied children be maintained in the least restrictive setting appropriate to their needs and that the government undertake prompt and continuous efforts toward placement with qualified family sponsors. *See* 6 U.S.C. § 279(b)(1)(C)–(D); 8 U.S.C. § 1232(c)(2). Defendant-Respondents' re-detention of J.A.L.L. violates these statutory requirements.

## COUNT FIVE
### VIOLATION OF THE *ACCARDI* DOCTRINE

79.     The Plaintiff-Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

80.     When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes, such that the agencies are bound to follow their own "existing valid regulations." *United States ex rel. Accardi Shaughnessy*, 347 U.S. 260, 266, 268 (1954). The *Accardi* doctrine also obligates agencies to comply with procedures set out in their operative manuals and binding guidance. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (finding that an agency is obligated to comply with procedural rules outlined in its internal manual).

81.     Defendant-Respondents have violated the applicable regulations governing ORR's custody, care, placement, and release of unaccompanied children—45 C.F.R. part 410 and ORR's Policy Guide—by failing to place J.A.L.L. in the least restrictive setting with his sponsor.

82.     Further, Defendant-Respondents have violated their own SIJ deferred action policy.

83.     J.A.L.L. has no adequate remedy at law.

## COUNT SIX
## RELEASE PENDING ADJUDICATION

84.     The Plaintiff-Petitioner realleges and incorporates contained in all preceding paragraphs of this Petition as if fully set forth herein.

85.     Pursuant to *Mapp v. Reno*, this Court has the "inherent authority" to set bail pending the adjudication of a habeas petition when the petition has raised (1) substantial claims and (2) extraordinary circumstances that (3) "make the grant of bail necessary to make the habeas remedy effective." 241 F.3d 221, 226 (2d Cir. 2001).

86.     J.A.L.L. presents numerous substantial constitutional and statutory claims challenging his detention.

87.     J.A.L.L. has demonstrated extraordinary circumstances thereby making him eligible for bail.

22

88. He requests immediate release pending adjudication of the instant petition.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff-Petitioner respectfully requests that this Court:

a. Assume jurisdiction over this matter;

b. Issue a Writ of Habeas Corpus ordering Defendant-Respondents to immediately release J.A.L.L. from their custody and place him in the custody of Mr. Lema without restraints on his liberty;

c. Enjoin the Defendant-Respondents from transferring J.A.L.L. away from the jurisdiction of this District and to enjoin his removal pending these proceedings;

d. Declare that J.A.L.L.'s arrest and detention violate the Due Process Clause of the Fifth Amendment; the Fourth Amendment; the Administrative Procedure Act; the *Accardi* Doctrine; and the Immigration and Nationality Act and implementing regulations;

e. In the alternative, immediately hold a bond hearing at which the Defendant-Respondents are required to establish by clear and convincing evidence that there is a lawful basis for J.A.L.L.'s detention and that there are no conditions other than confinement that will assure his appearance at any proceedings and mitigate any danger to the community.

f. Award reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

g. Grant such other and further relief as law and justice require.

Dated: December 19, 2025

*/s/ Christopher M. Mattei*
Christopher M. Mattei (CT 27500)
Renee Mihail (*pro hac vice forthcoming*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
cmattei@koskoff.com
rmihail@koskoff.com
*Attorneys for the Plaintiff-Petitioner*


*/s/ Martha Stone*
Sabrina Tavi (*pro hac vice forthcoming*)
CENTER FOR CHILDREN'S ADVOCACY
65 Elizabeth Street
Hartford, CT 06105
(860) 570-5300
mstone@cca-ct.org
stavi@cca-ct.org
*Attorneys for Plaintiff-Petitioner*

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

Pursuant to 28 U.S.C. § 2242, the undersigned hereby verifies under oath that that I have carefully reviewed the facts and legal arguments set forth in the above Complaint and Petition for Writ of Habeas Corpus, and that the allegations contained herein are true and correct to the best of my knowledge, information, and belief.

*/s/ Christopher M. Mattei*
Attorney for Plaintiff-Petitioner

## CERTIFICATE OF SERVICE

I, Christopher M. Mattei, counsel of record for the Plaintiff-Petitioner, do hereby certify that on the above-captioned date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Christopher M. Mattei
CHRISTOPHER M. MATTEI