**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| J.A.L.L., a Minor by his next friend, L.A.L.L., *Plaintiff-Petitioner*, v. David WESLING, in his official capacity as Director of the Boston Field Office; Todd LYONS, in his official capacity as Acting Director U.S. Immigration and Customs Enforcement; Kristi NOEM in her official capacity as Secretary of Homeland Security; Robert F. KENNEDY, JR. in his official capacity as Secretary of Health and Human Services; Angie SALAZAR, in her official capacity as Acting Director of the Office of Refugee Resettlement; Alex ADAMS, in his official capacity as Assistant Secretary of the Administration for Children and Families; Regina MOLLER, in her official capacity as Executive Director of Noank Community Support Services; U.S. Department of Homeland Security; U.S. Immigration and Customs Enforcement; U.S. Department of Health and Human Services; U.S. Office of Refugee Resettlement; Administration for Children and Families; Noank Community Support Services. *Defendant-Respondents*. | Case No. 3:25-cv-2125 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF-PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ....1

FACTUAL BACKGROUND ....2

A. J.A.L.L.'S SPECIAL IMMIGRANT JUVENILE STATUS ....2

B. J.A.L.L.'s ARREST AND DETENTION ....4

ARGUMENT ....8

I. J.A.L.L., THROUGH HIS NEXT FRIEND, HAS STANDING TO BRING THESE CLAIMS. ....8

II. PLAINTIFF-PETITIONER IS ENTITLED TO A PRELIMINARY INJUNCTION REQUIRING THE DEFENDANT-RESPONDENTS TO TERMINATE HIS UNWARRANTED AND UNLAWFUL DETENTION ....9

A. Plaintiff-Petitioner Is Likely to Succeed on His Substantive and Procedural Due Process Claims. ....10

1. Plaintiff-Petitioner Is Likely to Succeed on the Merits of His Fifth Amendment Substantive Due Process Claim and His Accompanying Administrative Procedure Act Claim Under 5 U.S.C. §§ 702 and 706. ....10

2. Plaintiff-Petitioner Is Likely to Succeed on the Merits of His Fifth Amendment Procedural Due Process Claim and His Accompanying Administrative Procedure Act Claim Under 5 U.S.C. §§ 702 and 706. ....13

B. Plaintiff-Petitioner Is and Will Continue to Suffer Irreparable Harm Absent Preliminary Injunctive Relief. ....15

C. The Balance of the Equities and the Public Interest Favor Granting Plaintiff-Petitioner Preliminary Injunctive Relief. ....17

CONCLUSION ....19

## INTRODUCTION

J.A.L.L. is a 17-year old high school student and resident of Massachusetts, who has been unlawfully detained and separated from his father by the United States Department of Homeland Security ("DHS") and Office of Refugee Resettlement ("ORR") since August 3, 2025 – over 138 days. J.A.L.L. hereby seeks from this Court a preliminary injunction ordering the termination of his current confinement at a restrictive facility in Mystic, Connecticut so that he can immediately return to his father and family. In addition to the months-long, ongoing deprivation of his constitutional rights and liberty, J.A.L.L. has suffered and continues to suffer severe depression, anxiety, trauma, and harm to his educational and emotional development. Plaintiff-Petitioner easily meets the required standard for a preliminary injunction, including the clear likelihood of success on the merits of his substantive and procedural due process claims.

The Defendant-Respondents' ongoing detention of J.A.L.L is patently illegal. After entering the United States in November 2020, J.A.L.L. sought and was granted Special Immigrant Juvenile Status ("SIJS") with Deferred Action which affords him protection from removal from the United States. Indeed, the removal proceedings that DHS commenced upon J.A.L.L.'s entry into the United States in 2020 were terminated by the Executive Office for Immigration Review, Boston Immigration Court in December 2023, on the basis of J.A.L.L.'s grant of SIJS with Deferred Action. At the time of his arrest, J.A.L.L. had been living for five years in Medway, Massachusetts with his father, who ORR had approved as J.A.L.L.'s sponsor in December 2020. With the protection of the SIJS with Deferred Action status that the United States Citizenship and Immigration Services ("USCIS") had granted to him, J.A.L.L. was simply waiting for a visa to become available so that he could adjust his status to Lawful Permanent Resident.

J.A.L.L.'s arrest, forcible separation from his father, and ongoing detention are affronts to the United States Constitution. The Defendant-Respondents' conduct has caused trauma and injury

to J.A.L.L., all of which is compounded daily by his continued detention and separation from his father and family. Plaintiff-Petitioner therefore seeks this Court's immediate intervention and the issuance of an injunction directing J.A.L.L.'s immediate release from the Defendant-Respondents' custody, to stop the irreparable harm that J.A.L.L. is suffering with each passing day.

For the reasons set forth herein in and in the attached exhibits and declarations, along with the reasons set forth in the Complaint for Injunctive and Declaratory Relief and Petition for Writ of Habeas Corpus (Dkt. No. 1), the Motion for Preliminary Injunction should be granted.

## FACTUAL BACKGROUND

### A. J.A.L.L.'S SPECIAL IMMIGRANT JUVENILE STATUS

In late 2020, J.A.L.L. fled Ecuador with his brother, having been abused, neglected, and abandoned by their mother, and seeking safety from gang violence and threats to their lives. On November 21, 2020, J.A.L.L. and his brother entered the United States. Declaration of Renee Mihail ("Mihail Decl.") ¶¶ 3-4, Ex. A. After J.A.L.L. entered the United States, DHS detained him, designated him as an "unaccompanied child," and initiated removal proceedings pursuant to 212(a)(6)(A)(i) of the INA (8 U.S.C. § 1182(a)(6)(A)(i)). Mihail Decl. ¶ 6, Ex. B. Due to his status as an unaccompanied child, J.A.L.L. was transferred to the custody of ORR. Mihail Decl. ¶¶ 7-8, Ex. C. J.A.L.L. remained in DHS custody until December 17, 2020 when he was released to the care and custody of his father, L.A.L.L. ("Mr. Lema"), who ORR had approved to be J.A.L.L.'s sponsor. Mr. Lema and J.A.L.L. returned to Medway, Massachusetts where J.A.L.L. lived under Mr. Lema's care and custody as his ORR sponsor until J.A.L.L.'s unlawful arrest on August 3, 2025. Mihail Decl. ¶¶ 9-10, Ex. D.

In March 2023, Mr. Lema began the family court process to obtain sole legal and physical custody of J.A.L.L. On July 14, 2023, the Massachusetts Probate and Family Court issued a Judgment of Dependency, pursuant to G.L. c. 119, § 39M, awarding Mr. Lema sole legal and

physical custody of J.A.L.L., finding that J.A.L.L. had been neglected and abandoned by his biological mother and that reunification with her was "not a viable option due to . . . neglect, abandonment, and a similar basis under Massachusetts law." The Court further found that it "is not in [J.A.L.L.'s] best interest to return to his or his parents' home country of nationality, Ecuador," where he would lack "stability, safety, and access to education and healthcare." Mihail Decl. ¶¶ 11-12, Ex. E.

On August 18, 2023, J.A.L.L. petitioned for SIJS with USCIS. On November 8, 2023, USCIS granted J.A.L.L.'s petition for SIJS and issued a grant of Deferred Action. The Approval Notice further provided that J.A.L.L.'s "grant of deferred action will remain in effect for a period of four years from the date of this notice unless terminated earlier by USCIS"[1] and that J.A.L.L. was eligible to apply for employment authorization. Mihail Decl. ¶¶ 13-14, Ex. F.

On December 26, 2023, the Executive Office for Immigration Review in Boston terminated J.A.L.L.'s removal proceedings on the basis that J.A.L.L. was "the beneficiar[y] of an approved special immigrant juvenile petition. This will allow USCIS to adjudicate the applications for adjustment of status in keeping with *Matter of Coronado Acevedo*, 28 I & N Dec 648 (AG 2022)." DHS did not oppose the termination of removal proceedings. Mihail Decl. ¶¶ 15-16, Ex. G.

Prior to J.A.L.L.'s unlawful arrest on August 3, 2025, there had been no further changes to his status. He had (and continues to have) special protection from removal as a SIJS beneficiary with Deferred Action, and his legal guardian and sponsor, Mr. Lema, continued to serve as J.A.L.L.'s ORR approved sponsor. For the past five years, J.A.L.L. has attended public school and has been a valued member of the Medway community. *See* Exhibit J (Declaration of J.A.L.L.) ¶¶ 7-9. J.A.L.L. and his family attend church together on Sundays and J.A.L.L. plays on his

[1] J.A.L.L.'s status as a Deferred Action recipient has never been terminated or revoked.

school's soccer team. Most recently, J.A.L.L. was enrolled at a public high school in Medway where he completed the 10th grade in June 2025. J.A.L.L. has had excellent school attendance and was a strong student who worked hard to earn A and B grades towards his goal of attending college. Ex. J. ¶¶ 8, 9, 33. In further recognition that he is lawfully present, J.A.L.L. received authorization from USCIS to seek and obtain employment in the United States, along with a social security card. Mihail Decl. ¶¶ 17-18, Ex. H; Mihail Decl. ¶¶ 19-20, Ex. I.

**B. J.A.L.L.'s ARREST AND DETENTION**

On August 3, 2025, J.A.L.L. and his older brother, Dennis, were visiting family in Buffalo, New York. While J.A.L.L., Dennis, and a friend (an American citizen) were sitting in Dennis's parked car, they were approached by two local police officers. The officers requested identification documents from all three individuals. J.A.L.L. and his brother provided their Employment Authorization Documents ("EAD"), and their friend provided his U.S. Passport at which point the officers let them go. They were not issued any citations or tickets. Ex. J. ¶¶ 11-12.

Shortly thereafter, as Dennis began driving away, those same police officers pulled them over. Although J.A.L.L. was not driving, the police officers asked J.A.L.L. for his driver's license. J.A.L.L. explained that he only had a driver's permit and his EAD. Again, the officers took J.A.L.L.'s EAD, his brother's EAD, and the friend's U.S. Passport, to their police car. After about 20 minutes, DHS officials arrived in two vehicles. Ex. J. ¶ 13.

The DHS officials directed J.A.L.L., his brother, and their friend to exit their car and patted them down. They then examined the same identification documents that the boys had presented to the police officers. The DHS officials used a camera device to confirm they matched the individual photos on the documents. One of the DHS officials advised them that they would be taken to an Immigration & Customs Enforcement ("ICE") facility where they would be fingerprinted and then released. The DHS officials handcuffed J.A.L.L. and his brother and placed them in one car, and

placed the friend, without handcuffs, in another car and transported them to the ICE facility. Ex. J ¶ 14.

At the ICE facility, multiple DHS officials, armed with guns, commenced an intimidating and deceptive confrontation with J.A.L.L., his brother, and their friend. They directed J.A.L.L. to answer their questions, stated that he could not call anyone, including his father, and did not inform J.A.L.L. that he had the right to speak with an attorney or to refrain from answering their questions. J.A.L.L. told the DHS officials that he and his brother lived in Massachusetts with their father and both had approved SIJS with Deferred Action, EADs, and that their removal proceedings had been terminated. J.A.L.L. also told the DHS officials that he had a valid social security number. *See* Mihail Decl. Ex. J. The DHS officials appeared to ignore this information and, instead, documented that J.A.L.L. had made certain statements that he did not make. The DHS officials swore at J.A.L.L. and used intimidating tactics, including threatening J.A.L.L. and his brother with deportation. They instructed and pressured J.A.L.L. and his brother to sign documents that were not translated into Spanish and were not explained by the DHS officials. Upon information and belief, J.A.L.L. and his brother were coerced into signing documents in which they purported to consent to their removal from the United States. Ex. J ¶¶ 15-21.

Dennis, who was 18 years old, was then transported to an adult detention facility, and J.A.L.L. was transferred to the custody of ORR and sent to a facility in Texas. Upon arriving in Texas, J.A.L.L. was informed by his caseworker that he would be deported to Ecuador because he had signed papers agreeing to be voluntarily removed from the United States. After J.A.L.L. objected, explaining that he had been pressured by the DHS officials to sign papers and had not known what the papers were, ORR indicated that it would begin to reunify J.A.L.L. with his father, who had already been approved and serving as J.A.L.L.'s sponsor for the past five years.

Ex. J ¶¶ 21-25.

J.A.L.L. was held in an ORR facility, Compass Cameron Connections, in Texas for approximately two months. He was confined inside a small house with four bedrooms and one main room, unable to leave, even to step into the yard, unless accompanied by staff. J.A.L.L. was required to be escorted by staff to the school building and other locations on the campus. Ex. J ¶¶ 26, 30. The education provided at the Texas facility was inadequate and below the education level that J.A.L.L. had been receiving at his school in Massachusetts, where he should have been in the 11th grade this year. Unlike a typical high school where students navigate between classrooms and learn content from specialized teachers, J.A.L.L. remained in one room for all lessons with students of vastly different ages and abilities. J.A.L.L.'s contact with his family was restricted in that he could only speak with approved family members for a few minutes, a few times per week. Ex. J ¶ 34.

On October 9, 2025, ORR transferred J.A.L.L. to Mystic, Connecticut and confined him at a restrictive facility operated by Noank Community Support Services. Ex. J ¶ 26. In Mystic, the facility is also a small house where J.A.L.L. is confined to three rooms: a bedroom, the living room, and a dining room. J.A.L.L.'s movements are restricted; he cannot go outside unless accompanied by shelter staff, and when outside, he must be near and in sight of staff at all times. Ex. J ¶ 31. His ability to maintain his exercise routine and physical fitness is limited by the restrictions on his ability to go outside and the lack of space and equipment indoors. J.A.L.L. must abide by a strict daily schedule which dictates daily activities such as when he can eat and when he must shower. Ex. J ¶ 34. His ability to speak with and see his family is restricted. Ex. J ¶ 35. The educational programming, such as it is, is inadequate to meet J.A.L.L.'s educational needs. Instruction is provided in the dining room at one table where the children eat their meals. There is

one instructor who teaches the same content to all of the children regardless of age, English proficiency, or educational ability and grade level. Ex. J ¶¶ 32-33. J.A.L.L. who last year studied subjects including geometry, biology, and history, and had been developing his English proficiency, is now taught basic math and is in a single "class" with non-English speaking students. Enrichment courses, such as piano and art, that J.A.L.L. previously enjoyed at his high school in Massachusetts are not available. Although J.A.L.L. should be in the 11th grade, he has not received any counseling regarding the college application process. Ex. J ¶ 33.

J.A.L.L. has now been in custody for over 138 days.

As a result of being forcibly and suddenly torn from his life and as a result of his prolonged detention, J.A.L.L. is suffering extreme emotional and psychological trauma, distress, and anxiety. He reports feeling "so sad and lonely" and "overwhelmed" by his emotions and anxiety. He reports suffering each day that he does not see his family and is missing out on fundamental aspects of their family life, such as worshiping together at church on Sundays. Ex. J ¶¶ 36-37. He reports feeling "anxious all the time" and having difficulty sleeping and eating because he is "so anxious and upset being separated from my family." Ex. J ¶ 36. The inability to move freely and do things that are fundamental to his well-being, such as go outside and exercise daily as he is accustomed to doing back home, are having a deleterious impact on J.A.L.L.'s physical and mental health. Being unable to move freely without a staff escort has resulted in J.A.L.L. feeling "trapped" and has damaged his sense of self; he reports feeling as though he is a "delinquent" who is "being punished." Ex. J ¶ 36.

J.A.L.L. is suffering from the trauma of having been torn from his life without the opportunity to say goodbye to friends and teachers at his school. He misses his friends and teachers, who he has not had any contact with, and worries that they do not know where he is and feels as

though he has simply "disappeared" from existence. Ex. J ¶¶ 22, 32-33. He is also suffering extreme trauma and distress from the manner in which he was separated from his older brother Dennis, who was 18 years old at the time of their unlawful arrest and who was, apparently, deported to Ecuador. Ex. J ¶ 27. He is distraught that he has missed half of the school year, has missed the opportunity to take challenging classes to prepare him for college, and has fallen behind academically. He reports feeling that everything he worked for "is lost and this is the end." Ex. J ¶¶ 27, 33.

Finally, the uncertainty of not knowing when or whether he'll ever be released, has inflicted extreme emotional distress on J.A.L.L. He reports feeling that he is "never going to get out of here" and losing "hope." Ex. J ¶¶ 28, 38. He reports forgetting basic facts about his life in Massachusetts, "because I'm spending way too much time here—like my friends' names, my teachers, all of the things that I wanted to do in the future." Ex. J ¶ 38. With each passing day that J.A.L.L. remains detained, he is having increased difficulty eating, sleeping, exercising, managing his sadness and anxiety, remembering his life, and maintaining hope.

## ARGUMENT

### I. J.A.L.L., THROUGH HIS NEXT FRIEND, HAS STANDING TO BRING THESE CLAIMS.

To establish standing under Article III of the U.S. Constitution, a plaintiff must allege "(1) an injury-in-fact, which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) that it is likely the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

J.A.L.L. is suffering an actual, concrete and particularized injury in that the Defendant-Respondents have forcibly separated J.A.L.L. from his family without cause or any legal basis, and confined him in a restrictive ORR facility for the last 138 days. No aspect of J.A.L.L.'s injury is conjectural or hypothetical; for every moment that he remains in confinement against his will and in violation of his Constitutional rights, J.A.L.L. is suffering severe emotional distress, anxiety, depression, and trauma, as well as harm to his emotional and educational development. J.A.L.L.'s. injury is caused entirely by the conduct complained of, notably, Defendant-Respondents' unwarranted and unlawful family separation and prolonged and ongoing detention of J.A.L.L. Finally, J.A.L.L.'s injury will be redressed by this Court's issuance of the requested relief, which will require Defendant-Respondents to end J.A.L.L.'s detention so that J.A.L.L. can return home to reunite with his family and resume his studies at his high school.

## II. PLAINTIFF-PETITIONER IS ENTITLED TO A PRELIMINARY INJUNCTION REQUIRING THE DEFENDANT-RESPONDENTS TO TERMINATE HIS UNWARRANTED AND UNLAWFUL DETENTION

Plaintiff-Petitioner satisfies every required element for this Court to preliminarily enjoin Defendant-Respondents from continuing their unlawful detention and separation of J.A.L.L. from his family.

"The Second Circuit has never applied a different standard for a temporary restraining order than for a preliminary injunction, and district courts have assumed them to be the same." *Foley v. State Election Comm'n*, 2010 WL 2836722 at *3 (D. Conn. July 16, 2010) (quoting *Allied Office Supplies, Inc. v. Lewandowski*, 261 F.Supp.2d 107, 108 n.2 (D. Conn. 2005). Preliminary injunctive relief is an extraordinary remedy and is never awarded as a matter of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *J.S.R. by and through J.S.G. v. Sessions*, 330 F.Supp.3d 731, 737 (D. Conn. 2018).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *New York Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter*, 555 U.S. at 20); *see also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 779-80 (2d Cir. 1994)) ("In most cases, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly' in the movant's favor."). "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *N. American Soccer League, LLC v. United States Soccer Fed'n,* 883 F.3d 32, 37 (2d Cir. 2018) (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). The plaintiff is required to "carry the burden of persuasion by a clear showing for each factor." *Bergamaschi v. Cuomo*, 2020 WL 1910754 (S.D.N.Y. Apr. 20, 2020) (internal quotation marks & citation omitted).

As set forth below, the Plaintiff-Petitioner satisfies all four factors required for seeking a preliminary injunction.

**A. Plaintiff-Petitioner Is Likely to Succeed on His Substantive and Procedural Due Process Claims.**

**1. Plaintiff-Petitioner Is Likely to Succeed on the Merits of His Fifth Amendment Substantive Due Process Claim and His Accompanying Administrative Procedure Act Claim Under 5 U.S.C. §§ 702 and 706.**

J.A.L.L. has a protected liberty interest in being reunited with his father. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (there is "a fundamental liberty interest" in children being

under the care, custody, and management of their natural parents); *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (Choices about family life are "'of basic importance in our society,' . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect.") (quoting *M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 (1996)); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("[T]he most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state."); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir. 1997) ("[T]he forced separation of parent from children, even for a short time, represents a serious impingement upon both parents' and child's rights) (internal citations omitted) (citing *Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994)). A substantive due process violation occurs when the government separates a child from his parents, "as the separation deprives the child[] of their right to family integrity." *J.S.R. by and through J.S.G. v. Sessions*, 330 F.Supp.3d 731, 741 (D. Conn. 2018).

In *J.S.R.*, the children in question similarly sought a preliminary injunction on the grounds that they had been forcibly separated from their parents, which violated their substantive and procedural due process rights. *Id.* at 738. The children sought both release from detention and reunification with their parents. *Id.* at 733. The Court found that "the Government violated [the children's] constitutional rights by forcibly removing them from their parents without due process of law." *Id.* at 741. The Court particularly noted that the Government failed to establish "a compelling reason for depriving the children of their family integrity—depriving them of their primary and only consistent source of support—or that its policy was narrowly tailored to achieve that compelling reason." *Id.* at 741-42. As a result, the Court found that the children were likely to succeed on the merits of their claim that they suffered a constitutional violation. *Id.* at 742.

The Defendant-Respondents' forcible separation of J.A.L.L. from his father violates substantive due process because the Defendant-Respondents lacks any legitimate, let alone compelling, interest in the separation of this child from his family. Substantive due process forbids the Defendant-Respondents from separating parents and their children unless there is a case-specific determination that separation is in the best interests of the child – as, for instance, when the child is in danger or the parent is shown to be unfit. *See Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (family-integrity interest "is counterbalanced by the compelling governmental interest in the protection of minor children"); *United States v. Loy*, 237 F.3d 251, 269-70 (3d Cir. 2001) ("[W]here there is insufficient evidence to support a finding that children are potentially in danger from their parents, the state's interest cannot be said to be 'compelling,' and thus interference in the family relationship is unconstitutional."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("[T]he Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family . . . without some showing of unfitness and for the *sole reason* that to do so was thought to be in the children's best interest."). Defendant-Respondents have never made a case-specific determination, and cannot demonstrate, that separating J.A.L.L. from his father is in J.A.L.L.'s best interests. A state court previously determined that it is in J.A.L.L.'s best interests to live under the care and custody of his father and ORR previously determined that J.A.L.L.'s father is a suitable sponsor. Nothing has occurred to alter those determinations. As such, the Defendant-Respondents lacks a proper justification for the ongoing separation of J.A.L.L. from his father.

"This practice of separating class members [i.e., migrant parents] from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their

due process claim." *J.S.R. by and through J.S.G. v. Sessions*, 330 F.Supp.3d 731, 741 (D. Conn. 2018). "Children have a 'constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association.' " *Maldonado v. Lloyd*, 2018 WL 2089348, at *7 (S.D.N.Y. May 4, 2018) (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000)). Here, J.A.L.L. has been held in ORR custody and separated from his father for over 138 days, and Defendant-Respondents' unwarranted and unlawful separation is ongoing. "There is no doubt that Defendant-Respondents' actions have 'encroached' upon [J.A.L.L.] right to family integrity 'considerably.'" *Id.* (citing *Beltran v. Cardall*, 222 F. Supp. 3d 476, 482 (E.D. Va. 2016)).

**2. Plaintiff-Petitioner Is Likely to Succeed on the Merits of His Fifth Amendment Procedural Due Process Claim and His Accompanying Administrative Procedure Act Claim Under 5 U.S.C. §§ 702 and 706.**

Defendant-Respondents' actions of detaining and separating J.A.L.L. from his father without first providing notice and any opportunity to be heard, constitute an egregious violation of J.A.L.L.'s procedural due process rights. A procedural due process violation occurs when the government separates a child from his parents and the child is "given no notice and no fair opportunity for a hearing before being separated from [his] parent." *J.S.R. by and through J.S.G. v. Sessions*, 330 F.Supp.3d 731, 741 (D. Conn. 2018). "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Procedural due process claims are analyzed under the *Mathews v. Eldridge* four-part test: the Court must balance the private interest affected by the government's action; the risk of erroneous deprivation; the probable value of additional safeguards; and the Government's interest in more limited procedures. *Id.* at 334-35.

At the very least, procedural due process requires a pre-deprivation hearing before the government may separate children from their parents. *See, e.g.*, *Stanley v. Illinois*, 405 U.S. 645,

658 (1972) (striking down state's presumption of unfitness for unmarried fathers, and holding that all parents "are constitutionally entitled to a hearing on their fitness before their children are removed from their custody"); *see also Brock v. Roadway Express, Inc.*, 481 U.S. 252, 261 (1987) (quoting *Mathews*, 424 U.S. at 333) ("Though the required procedures may vary according to the interests at stake in a particular context 'the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.' "). Regardless of immigration status, the government cannot arrest and detain anybody without any process. Because of J.A.L.L.'s SIJS with Deferred Action, DHS had no basis for his detention to begin with, as he is lawfully present in the United States and was under the care and custody of his ORR-approved sponsor at the time of his arrest.

Courts have recognized the enormous interests at stake of removing a child from the care of their parents and placing them into the custody of the state. "[C]hildhood is a particularly vulnerable time of life and children erroneously institutionalized during their formative years may bear the scars for the rest of their lives." *Parham v. J.R.*, 442 U.S. 584, 628 (1979) (Brennan, J., concurring in part and dissenting in part). To avoid the grave consequences that flow from indefinitely placing a child into institutionalized custody, a child such as J.A.L.L. and his father must be afforded the opportunity to consider preferable alternatives in a pre-deprivation hearing.

Defendant-Respondents' violations are far more egregious than the failure to provide sufficient pre-deprivation process to affected parties; Defendant-Respondents failed to provide *any* process at all, before or after whisking J.A.L.L. away from his father. At the *very least*, procedural due process requires affected parties to be given notice and a set of procedural opportunities to protect their liberty interests. *Cf. Rivera v. Marcus*, 696 F.2d 1016, 1027-29 (2d Cir. 1982) (applying *Mathews* to hold foster parent specifically entitled to notice, opportunity to retain

counsel, pre-removal hearing, and robust rights at that hearing before state could terminate foster parent status). Here, where the Defendant-Respondents have taken a child away from his father, an utter lack of process failed to provide J.A.L.L. an "opportunity to be heard at a meaningful time and in a meaningful manner" before being forcibly separated from his parent. *Mathews*, 424 U.S. at 333. Because J.A.L.L. was constitutionally entitled to meaningful process before being torn from his father, Plaintiff-Petitioner is likely to succeed on the merits of his procedural due process claim.

### B. Plaintiff-Petitioner Is and Will Continue to Suffer Irreparable Harm Absent Preliminary Injunctive Relief.

The Defendant-Respondents have violated and—unless enjoined by this Court—will continue to violate the constitutional and statutory rights of J.A.L.L. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (quotations and citation omitted); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

J.A.L.L.'s unlawful detention has caused irreparable harm in that he has been separated from his father—who a state court appointed as the child's sole legal and physical guardian and who ORR previously approved as a sponsor—for over 138 days. J.A.L.L. has been taken from his safe, loving home where he lives with his father, sister, aunt, and cousins, only to be institutionalized. He is unable to move freely, must be accompanied everywhere he goes, and cannot play outside when he wishes, maintain his physical fitness, or see his friends. J.A.L.L. is suffering from extreme emotional anxiety, trauma, and chronic sadness; he cries frequently and feels emotionally unstable and hopeless that he will ever be released. He is suffering irreparable

harm in that prolonged detention is affecting his development and his ability to sleep, eat, and remember basic facts about his life in Massachusetts, such as his friends' and teachers' names. Irreparable harm has been caused to J.A.L.L.'s academic progress in that he has missed half of the school year, has fallen behind in his education, and is not receiving age or grade-appropriate education in detention. He has been forced to miss opportunities that are basic to the physical, emotional, and intellectual development of a teenager, such as socializing with peers, playing on his school basketball team, and receiving pre-college counseling. Every day that J.A.L.L. is detained in a shelter, he suffers irreparable harm to his emotional, physical, educational, and developmental well-being.

The ongoing harm that Defendant-Respondents are wreaking on young J.A.L.L. go far beyond those that typically flow from rights violations. The trauma of family separation causes especially severe and irreparable injuries, particularly when inflicted upon vulnerable children like J.A.L.L.. Thus, for example, the American Academy of Pediatrics has denounced Defendant-Respondents' practice of separating children like J.A.L.L. from his parent, explaining that the "[s]eparation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for [the] safety of the child at the hand of [the] parent." Julie M. Linton, et al, *Detention of Immigrant Children*, 139 (5) AMERICAN ACADEMY OF PEDIATRICS (2017) (reaffirmed November 2022).

In recognition of the unique vulnerabilities of children and the trauma of family separation, courts have held that separation of parents and children visits irreparable harm on both. *See, e.g.*, *McLaughlin v. Pernsley*, 876 F.2d 308, 315 (3d Cir. 1989) (holding that family separation causes irreparable harm because "the bonds between the [parents] and their foster child will weaken continuously with the passage of time apart"); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th

Cir. 1997) ("[F]orced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights.") (internal quotations removed); *Nicolson v. Pappalardo*, 685 F.Supp.2d 142, 145-46 (D. Me. 2010) (holding that "[e]very additional day" of separation causes further harm); *cf. Stanley v. Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of his children, and the children suffer from uncertainty and dislocation."); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) ("separation from family members" constitutes irreparable harm) (quotation marks omitted). Given the well-established facts about the trauma caused by separating a child from their family generally, as well as the injuries demonstrated by J.A.L.L. specifically, this Court should hold the same.

### C. The Balance of the Equities and the Public Interest Favor Granting Plaintiff-Petitioner Preliminary Injunctive Relief.

The final requirements for preliminary injunctive relief are that "the balance of equities tips in [the moving party's] favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted). And "where the Government is an opposing party, the public interest and balance of equities factors 'merge.'" *Succow v. Bondi*, 2025 WL 818622, at *3 (D. Conn. Mar. 14, 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435-36 (2009)).

Both factors tip sharply in favor of granting Plaintiff-Petitioner's request for preliminary injunctive relief. The balance of equities tips in Plaintiff-Petitioner's favor because the relief requested would remedy significant violations of J.A.L.L.'s constitutional rights while causing no injury to Defendant-Respondents. All that is required of the Defendant-Respondents is to stop violating the law by immediately releasing J.A.L.L. "The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or

administrative burdens on the Government." *Sajous v. Decker*, 18-CV-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)).

Similarly, "the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Id.* (citing *Mitchell*, 748 F.2d at 808). The public has no interest in the continued, unwarranted and unlawful family separation and detention of J.A.L.L., a vulnerable child with SIJS, Deferred Action, and an already-approved sponsor. Accordingly, this factor further militates in favor of the issuance of a preliminary injunction.

**CONCLUSION**

For the foregoing reasons, the Plaintiff-Petitioner respectfully requests that the Court grant his Motion for Preliminary Injunctive Relief.

Respectfully submitted,

By: */s/ Christopher M. Mattei*

Christopher M. Mattei (CT 27500)
Renee Mihail (*pro hac vice forthcoming*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
cmattei@koskoff.com
rmihail@koskoff.com
*Attorneys for the Plaintiff-Petitioner*

*/s/ Martha Stone*

Martha Stone (CT 00080)
Sabrina Tavi (*pro hac vice forthcoming*)
CENTER FOR CHILDREN'S ADVOCACY
65 Elizabeth Street
Hartford, CT 06105
(860) 570-5300
mstone@cca-ct.org
stavi@cca-ct.org
*Attorneys for Plaintiff-Petitioner*

**CERTIFICATE OF SERVICE**

I, Christopher M. Mattei, counsel of record for the Plaintiff-Petitioner, do hereby certify that on the above-captioned date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Christopher M. Mattei*
CHRISTOPHER M. MATTEI